THE PENN MUTUAL LIFE INSURANCE COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 52577. Promulgated June 28, 1935.

*Robert Dechert, Esq.*, for the petitioner.
*De Witt M. Evans, Esq.*, for the respondent.

OPINION.

MORRIS: Four allegations of error, one being an affirmative allegation of the respondent, involve the deductibility of " interest " under section 245 of the Revenue Act of 1926, which, for our purposes, is identical with section 203 (a) (8) of the Revenue Act of 1928, providing:

(a) In the case of a life insurance company the term "net income" means the gross income less—

\*       \*       \*       \*       \*       \*       \*

(8) All interest paid or accrued within the taxable year on its indebtedness \* \* \*.

In *Fall River Electric Light Co.*, 23 B. T. A. 168, we had under consideration the language of section 234 (a) (2) of the Act of 1926, providing for the deduction of "All interest  \*  \*  \*  on its indebtedness." We there adopted the following definition: " Interest on indebtedness has a definite and well accepted meaning as ' the compensation allowed by law or fixed by the parties for use, or forbearance, or detention of money.' [citations] ", and in *Lafayette Life Insurance Co.*, 26 B. T. A. 946; reversed, 67 Fed. (2d) 209, we quoted with approval the dictionary definition of the word "interest " as "An agreed or stipulated compensation accruing to a creditor during the time that a loan or debt remains unpaid." See also *Joseph W. Bettendorf*, 3 B. T. A. 378.

The Supreme Court of the United States, in *Duffy* v. *Mutual Benefit Life Insurance Co.*, 272 U. S. 613, used some pertinent language. In that case the respondent was a mutual life insurance company having no capital stock, conducting its business upon the " level premium plan ", under which the estimated annual cost of insurance is averaged and the maximum annual contribution of each member is uniform through the life of the policy. The annual contributions during the early years of the policy are in excess of the natural premiums and such excess premiums, augmented by interest thereon, are held as a reserve to maintain insurance in the later years. The company was required by state law to maintain its assets at a sum not less than the amount of " legal reserve " required by such laws. The

respondent there, in its return filed for the year 1917, included such reserve in its invested capital under the act then in force. The question of its inclusion was finally contested in the Supreme Court. It having been contended there that such reserve represented a present existing liability, the Court said in disposing of such contention:

\* \* \* These assets, thus constituted, have never represented indebtedness any more than the capital of a stock corporation subscribed by its stockholders represents indebtedness. Until the maturity of a policy, the policyholder is simply a member of the corporation, with no present enforceable right against the assets. Upon the maturity of the policy he becomes a creditor with an enforceable right. Then for the first time there is an indebtedness. \* \* \* In the meantime, each member bears a relation to the mutual company analogous to that which a stockholder bears to the joint-stock company in which he holds stock. In either case, the title to the assets is in the corporation and not in the members or stockholders. \* \* \*

Because of the relationship which the respondent's affirmative allegation bears to three similar issues raised by the petitioner, we shall dispose of this issue first. He claims to have erred in allowing the petitioner to deduct as "interest on indebtedness" the sums of $181,764.13 for the year 1926 and $10,117.19 for the year 1928, purporting to represent "interest" on deferred dividends paid to policyholders under the so-called "accumulated-surplus plan" policy.

In support of this issue the respondent relies not only upon the total absence of a contractual obligation to pay interest to its policyholders under such policies, but upon our decision upon a very similar type of policy in *Lafayette Life Insurance Co.*, *supra*. The petitioner, on the other hand, contends not only that there was an obligation to pay "interest", but that the facts in the instant case are distinguishable from the case relied upon by the respondent, asserting, however, that even if the facts were identical it would still disagree with the conclusion there reached.

We have carefully considered the petitioner's contentions urged by counsel at the trial and set forth on brief, but they fail to convince us of any statutory justification for the deduction claimed by it, and, in our opinion, erroneously allowed by the respondent. We base our conclusion upon a thorough consideration of the policy contract itself and the testimony respecting it, supported by *Lafayette Life Insurance Co.*, *supra*, and *Missouri State Life Insurance Co.*, 29 B. T. A. 401, in which we reiterated the position taken in the former proceeding, although reversed on that issue by the circuit court.

In the latter proceeding, after setting forth provisions of the policy strikingly similar to those here, the Board said:

The method followed by petitioner with respect to the apportionment of the deferred dividends on these policies was to set aside each year an amount as representing the profits of such year allowable to the policy, the total of these

sums representing the sum apportioned as a deferred dividend at the close of the tontine period. In each year it also set aside on each policy an amount designated as interest and computed at 3½ per cent compounded annually upon the amounts theretofore set aside as apportioned profits of prior years. The total of these sums was paid to the policyholder at the close of the period. The question here presented is whether those portions of the payments made in the taxable years which represented the so-called *interest* computed, were in fact payments of interest upon debts or obligations of petitioner or whether the entire payment in each case was one of deferred dividends.

In *Lafayette Life Insurance Co., supra*, we had a situation substantially similar to this before us. In that case we said:

> Nor can it be said that the deferred dividends constituted debts owed by petitioner during the 20-year period of the tontine policies. A debt in its general sense is " a specific sum of money which is due or owing from one person to another, and denotes not only the obligation of the debtor to pay, but the right of the creditor to receive and enforce payment." *J. S. Cullinan,* 19 B. T. A. 930. During the tontine period none of the deferred dividends constituted " a specific sum of money due or owing " from petitioner to a policyholder and enforceable by the latter. Not until the end of such period could it be determined who of the policyholders might be entitled to deferred dividends. Indeed, it is quite conceivable that none would be so entitled. It is clear, we think, that under such circumstances the so-called interest payments could not properly be deemed interest. They constituted additional dividends rather than interest.

It will be noted that there is no agreement in the policy here in question to pay interest upon deferred dividends, and we think it immaterial how petitioner computes the amount allocable to the policy for each year, the total of which it pays at the close of the tontine period, which is the date its obligation to make any payment accrues. Petitioner attempts to distinguish the above cited case upon the ground that the apportionment of profits for each year and the computation of interest thereon was made at the close of the tontine period, whereas in the present case it was made each year and the tentative credits to the policy then transferred from surplus. We see in that no material difference. It was at most, in our opinion, merely a different method of recording upon the corporate books a transaction in all respects similar to the one before us in *Lafayette Insurance Co., supra.* In both cases the obligation was similar and the payments made were identical in character.

We can not conclude from the mere use of the terms " surplus ", " accumulated-surplus " or " accumulated-surplus plan ", without even the slightest suggestion in the contract of the payment of " interest ", that there was either moral or legal obligation to pay such interest, as the petitioner would have us do. Furthermore, the policy being payable only after the conclusion of the accumulated-surplus period, which might be anywhere from ten to twenty or more years, not only were the survivors to benefit under such plan unknown, but the amounts of the obligations thereunder were impossible of exact ascertainment when the contracts were entered into. If all policyholders completed their accumulated-surplus period, the amount payable under the contract would be one thing, but if only a very few did so it would be quite another thing.

For the above and foregoing reasons we hold that the respondent's allowance of the amounts set forth under this issue as deductions was incorrect, and his affirmative allegation in respect thereto is accordingly sustained.

Coming now to the petitioner's first and second assignments of error. Under those issues two classes of alleged interest are claimed as deductions: (a) "guaranteed interest" at 3 percent included in the installments-certain, and (b) the "excess" or "additional" interest, both of which are provided for in section 7 of the policy contract first set forth hereinabove.

The type of policy involved under this issue becomes payable, upon the death of the insured, in a stated number of installments over a period of years to the beneficiary therein named. The so-called guaranteed interest is the difference between the commuted value at the date of death of the insured and the total amount the petitioner is obligated to pay as installments-certain.

A feature of this policy which must necessarily be borne in mind is that although it matures upon the death of the insured, neither the beneficiary nor his estate has any contractual claim against the petitioner for the payment of installments-certain until each installment falls due and becomes payable and that the amount of such installment is determined at the time the contract is entered into, and does not change, and the reserve required by law to be set aside for such payment is based upon the amount found under "The American Experience Table of Mortality with interest at 3 per cent, per annum, according to the net level premium method." The 3 percent interest provided for in section 7 has no independent significance in the policy. It effects no change or alteration in the original basis of determining the installment-certain. Such provision was inserted there, according to our construction of the contract, for the sake of clarity, and so that there may be no dispute as to the rights of the beneficiary's estate, in the event of his death prior to receiving the full number of installments, to receive the remainder of such installments, computed upon the same basis as theretofore employed in the case of the beneficiary himself.

In principle this case is no different from *Missouri State Life Insurance Co.*, *supra*. There is no agreement in this contract to pay interest, as such, and the fact that the petitioner in writing its contract separates the component parts of the reserve to be set aside for the ultimate payment of such installments into strict reserve, as determined by the American Experience Table of Mortality, and the amount of interest required to maintain such reserve at a level sufficient to insure payment upon maturity, is merely a matter of computation which, in our opinion, is quite immaterial. The amount so arrived at and paid to the policyholder constitutes a

policy obligation and as such is not "interest paid or accrued on indebtedness within the meaning of section 245 (a) (8) of the applicable Revenue Acts." *Reserve Loan Life Insurance Co.*, 18 B. T. A. 359.

It is obvious from what we have said respecting the two preceding issues that the so-called excess interest deductions deserve the same treatment, for there is considerably less justification for their deduction than for those where there is at least an obligation to pay the amounts claimed as deductions. Under this issue there was no obligation on the part of the board of trustees ever to award additional amounts. At any rate, what was paid amounted to nothing more than voluntary distributions of earnings.

The " ordinary life policy ", under which the disputed amounts arise in allegation of error numbered three, provided in section 7 thereof for certain options available to the beneficiary, or to the insured during his lifetime, among which there was one permitting such beneficiary upon the death of the insured to leave the " net proceeds  *  *  * with the company at interest at the rate of 3 per cent per annum, increased annually by such additions as may be awarded by the Board of Trustees  *  *  *."

The respondent disallowed the deductions claimed under this issue and he opposes the petitioner's efforts in this action to have such amounts allowed upon the sole ground that they have been included in the reserves required by law and the 4 percent mean thereof allowed as a deduction under the statute in the computation of net taxable income. He asserts as a fact that such amounts were included in the reserve, but we are unable to so conclude from the proof offered. However, whether the amounts were included in the reserve required by law or not—such inclusion might have been made erroneously under the statute, though it is unnecessary to decide that question in this proceeding. See *Standard Life Insurance Co. of America*, 13 B. T. A. 13; affd., 47 Fed. (2) 218; *Continental Assurance Co.* v. *United States*, 8 Fed. Supp. 474, and *Helvering* v. *Inter-Mountain Life Insurance Co.*, 294 U. S. 686.

The respondent concedes that the arrangement under this contract " is somewhat similar to a beneficiary loaning the insurance company a sum certain at 3 per cent interest " and he says " It may even be conceded that under certain circumstances the payments made to the beneficiaries, particularly the 3 percent, might possibly be deducted as interest on indebtedness."

It will be observed that the arrangement under the provisions of the contract here discussed are supplementary to the policy obligation. The petitioner agrees that if the beneficiary will forego the right to receive the net proceeds payable to him under the contract immedi-

ately upon the death of the insured and if he will permit the petitioner to retain such amount for a stated period of time, it will compensate him by the payment of 3 percent interest. A new relationship between new and different parties springs into being—an indebtedness actually arises upon the death of the insured and the immediate satisfaction thereof is postponed by the debtor, on the one hand, and the creditor on the other. There is no life contingency involved in this new transaction. An indebtedness arises under the contract between the petitioner and the beneficiary and the interest is paid upon such indebtedness. Therefore, we are of the opinion that the guaranteed interest payments of 3 percent are allowable deductions under the provisions of the applicable sections of the act hereinbefore set forth and discussed. There was no obligation upon the petitioner to pay any amounts in excess thereof, and such excess is not deductible.

Issues numbered four and five pertain to the disallowance of deductions from gross income, for the taxable year 1928, of realty taxes, maintenance expenses and depreciation upon the petitioner's home office building and to the inclusion in its gross income of an amount representing the assumed rental value of space occupied by it in its said building during the year 1926. Deductions may not be allowed to a life insurance company for depreciation, taxes, and expenses incurred in connection with a building owned by it, unless there is also included in gross income the rental value of the space occupied by it. *Helvering* v. *Independent Life Insurance Co.*, 292 U. S. 371 and *Rockford Life Insurance Co.* v. *Commissioner*, 292 U. S. 382, decided after the submission of this proceeding. There is therefore no merit in the petitioner's present contention that it erroneously included such rental value in its return for 1926. As to the year 1928, the petitioner is entitled to the claimed deductions but, in order to compute the net benefit which it is entitled to, the rental value of the space occupied by it must be included in its gross income. *Peoples Life Insurance Co.*, 31 B. T. A. 706; see also *Commonwealth Life Insurance Co.*, 31 B. T. A. 887.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

MATTHEWS dissents.

————

McMAHON, dissenting: I dissent from the holding of the majority in this proceeding that any portion of the amounts of $81,747.68 and $175,292.12, representing so-called " interest " paid by the petitioner in the respective years 1926 and 1928 to beneficiaries upon the proceeds of ordinary life insurance policies which had matured by death of the insured and which had been left with the petitioner

under Option D of the policies is deductible as interest under the Revenue Acts of 1926 and 1928. Each of these figures is made up in part of a sum calculated at 3 percent and in part of a sum calculated at 1.85 percent. The majority holds that the portion of those amounts which represents the 3 percent guaranteed so-called "interest" is deductible as interest under the revenue acts, but that the portion of such amounts representing the 1.85 percent additional so-called "interest" is not deductible under the statutes. No part of either amount is deductible under such acts as interest.

If, as held by the majority, the portion representing the 1.85 per cent is not deductible as interest, then, looking to substance and not to form, as we must do, the same reasoning requires a holding that no portion of either amount constitutes deductible interest. The holdings of the majority as to these two percentages are irreconcilable. The source and nature of the 3 percent and the 1.85 percent are the same. Speaking figuratively, they are cut out of the same cloth. Both came from surplus and both represent earnings or profits upon funds held by the petitioner. The denial of the deduction of the 1.85 percent is jutifiable only on the ground that it is in the nature of a distribution of earnings. The same is true of the 3 percent. Such earnings or profits of a mutual life insurance company, such as petitioner, operated upon a participating plan of insurance, are derived from numerous sources, including (1) "saving in mortality", where the mortality conditions experienced prove to be more favorable than those assumed, (2) returns on investments, (3) "profit from loading" of premiums or, more simply stated, from overcharges in premiums, (4) surrender of policies, (5) lapse of policies, and (6) investment or capital transactions. All these earnings or profits go into what is termed "surplus."[1] Three percent is the minimum amount which experience has shown that a well managed solvent life insurance company is thus able to earn and pay even under unfavorable conditions. The same experience has also shown that under normal conditions such a company can earn considerably in excess of 3 percent.[2] The 1.85 percent herein involved represents excess over 3 percent. The payment of the full amount of 4.85 percent undoubtedly would have been assured under Option D except that the company could not be positive that 4.85 percent could be earned and paid. However, the fact that only 3 percent was assured does not mean that the company was not bound to pay more than that if more than that were earned and safely payable. Under the laws

---

[1] See discussion of "Dividends" in Life Insurance, by Joseph B. Maclean, 3d Ed., 1932, ch. 11, p. 226.

[2] In Life Insurance, by Joseph B. Maclean, 3d Ed., 1932, p. 173, it is stated: "At the present time the net rate earned by the companies varies from 4½ to over 5 per cent, which is approximately the rate yielded by high class securities." (Emphasis supplied.)

of Pennsylvania, under which the petitioner was organized, the petitioner may maintain a surplus or safety fund, but the same may not be in excess of 10 per centum of its reserve, or $100,000, whichever is greater, and the excess of the market value of its securities over their book value.[3] Furthermore, the laws of Pennsylvania require that all such policies shall contain a provision that the policy shall participate in the surplus of the company, while it remains in force.[4] It is doubtful whether any state would permit petitioner to continue to issue policies therein if it did not pay over under Option D all it could earn and safely pay, which, in the instant proceeding, has been demonstrated to be at least 4.85 percent.

All the policies involved in the instant proceeding participated in surplus, and this is true as to both insured and beneficiaries. The ordinary life policy expressly provides that the 3 percent per annum payable under Option D shall be increased annually by such additions as may be awarded by the board of trustees. The rights of the beneficiary are such as are conferred primarily by the policy or contract of insurance. 37 Corpus Juris 577. When a beneficiary is named in a policy he is as much entitled to rely upon its provisions for the protection of his rights as the insured or the company. *Taff* v. *Smith*, 144 S. C. 306; 103 S. E. 551. All of the features of the policy in question from this standpoint inure to the benefit of the beneficiary. In *Penn Mutual Life Insurance Co.* v. *Norcross*, 163 Ind. 379; 72 N. E. 132, the Supreme Court of Indiana had under consideration a surplus participating policy of this petitioner. The court there held that where the policy had been delivered and had become effective, the beneficiary had an interest therein which could not be divested by the insured without her consent.

It is clear that the 1.85 percent did not constitute a purely voluntary payment as in effect held by the majority; but it was paid by virtue of a policy or contract obligation imposed by statute.

The holding of the majority that the 3 percent paid under Option D of the ordinary life policies is deductible as interest is irreconcilable with its holding that the 3 percent included as part of installments paid under ordinary life policies which had been converted to the installment basis of payment by the exercise of Option A therein is not deductible as interest. Both holdings of the majority pertain to the same type of policy, ordinary life, and the same 3 percent; upon the death of the insured, the proceeds of Option D and of

---

[3] Section 614 of Title 40 of Purdon's Pennsylvania Statutes, Annotated, Permanent Ed., 1930. (1921, May 17, P. L. 682, Art. IV, sec. 429.)

[4] Section 510 (f) of Title 40 of Purdon's, Pennsylvania Statutes, Annotated, Permanent Ed., 1930 (1921, May 17, P. L. 682, Art. IV, sec. 410).

Option A are each equivalent substantially to the proceeds of the face value of the policy and hence are equivalent substantially to each other; the factor of 3 percent is identical; and both holdings should be the same and to the effect that the 3 percent paid under Option D as well as the 3 percent paid under Option A is not deductible.

The holding of the majority that the 3 percent paid under Option D is deductible is also irreconcilable with its holding that the 3 percent included as part of installment payments made under trust certificate or installment policies is not deductible as interest. Upon the death of the insured the proceeds of this latter type of policy are identical with the proceeds of Option A under the ordinary life type; the factor of 3 percent is identical in the proceeds of each; and both holdings should be the same and to the effect that the 3 percent paid under Option D as well as the 3 percent paid under the trust certificate or installment type of policy is not deductible.

From the policy of this type in evidence it clearly appears that the $18,380, which is the cash surrender or " lump sum " value at the date of death of the insured, is the sum which at 3 percent so-called compound " interest " will return a total of $24,000 to the beneficiary when paid in 240 equal monthly installments of $100 each.

Under all of the petitioner's policies, in evidence here, participating as to policyholders or beneficiaries, or both, the amounts ultimately received under the various options or provisions are all the equivalent substantially of the face value or of the present worth or commuted value at the date of death.[5] Otherwise there would be unjustifiable discrimination between participating policies of a mutual life insurance company.

Options A and D are each equivalent to the face value of the policy and therefore A is equivalent to D. Since no part of the installment payments made by petitioner to beneficiaries under Option A of ordinary life policies (or under trust certificate or installment policies) constitutes interest, as the majority correctly holds, then no part of the payments made under Option D is interest.

Likewise, the holding of the majority that the so-called " interest " paid upon deferred dividends under the ordinary life accumulated surplus plan policies is not deductible is irreconcilable with its holding that the 3 percent paid under Option D is deductible. The majority bases its holding as to so-called " interest " upon these deferred dividends upon the ground that there is no indebtedness be-

[5] The Essence of Life Insurance, by William Breiby, 1924, p. 87, and Life Insurance, by Joseph B. Maclean, 3d Ed., 1932, pp. 49, 50.

cause there is no certainty as to who will survive and ultimately receive all of the deferred dividends. However, it may be pointed out that there is even more uncertainty as to who will ultimately receive all of the proceeds left with the company under Option D. To illustrate, the proceeds in whole or in part may be payable to a person or persons not yet born at the time of the death of the insured.

It has been held that whether and to what extent deductions shall be allowed depends upon legislative grace; and that only as there is clear provision therefor can a deduction be allowed. *New Colonial Ice Co.* v. *Helvering*, 292 U. S. 435. In *Helvering* v. *Inter-Mountain Life Insurance Co.*, 294 U. S. 686, the Supreme Court, with respect to statutory provisions allowing another type of deduction to life insurance companies, stated in part:

\* \* \* It is intended to define a deduction which they are permitted to make in the calculation of the net amount to be taxed. The rule that ambiguities in statutes imposing taxes are to be resolved in favor of taxpayers does not apply. Deductions are allowed only when plainly authorized. *Ilfeld Co.* v. *Hernandez*, 292 U. S. 62, 66. *New Colonial Co.* v. *Helvering*, 292 U. S. 435, 440.

The fact that the 3 percent is sometimes designated as " interest " in the ordinary life policy or is treated as interest by the petitioner does not determine the question of whether it is deductible interest under the Federal statutes, *Baltimore & Ohio R. R. Co.*, 29 B. T. A. 368, 372, and *Irving N. Klein*, 31 B. T. A. 910; and it is sometimes designated as interest *income* in the same policy. That it is not exclusively designated as interest in the policy, but is also designated primarily as *income* there, is significant. Nor does the fact that it is guaranteed or assured determine that it is interest under such statutes any more than the fact that certain dividends are assured to a certain extent on preferred corporate stocks renders such dividends interest and not earnings by way of dividends. Under Option D the 3 percent rate is merely a minimum rate of earnings and not interest; and in such preferred dividends the rate fixed is merely a maximum of earnings and not interest. The figure and words " 3 percent " are also used in the policy in describing the reserve basis upon which petitioner operates.

The word " interest " is used in petitioner's type of ordinary life policy only once in its true sense. It is provided therein that interest at 6 percent shall be paid to the petitioner by any policyholder who borrows from petitioner against his policy and upon the security thereof. Hence, it appears from the language of this type of policy that the term " interest " as applied to proceeds of policies left with the company under Option D is not used in the same sense as it is used in describing interest upon money loaned by the petitioner upon the security of its policies.

The proceeds were not borrowed by the petitioner from the beneficiaries. Ordinarily money at interest is borrowed for the use of the borrower in his business or for his other purposes. This is not true in the instant proceeding. Under the provisions of the policy the proceeds were " left with " the petitioner. The petitioner, so far as the record shows, did not need or use these proceeds for its own purposes, but simply conserved them for the benefit of the beneficiary in accordance with the provisions of the policy. To constitute interest there must be definite terms with respect to designation of the person or persons to whom the principal and interest are to be paid, the time and place of payment, the amount of the principal, and the rate. A fair test of whether the terms are definite enough to constitute interest is whether the borrower may make payment of the principal and interest at some definite agreed time and place or make legal tender thereof, and thus stop the running of the interest. Here the evidence does not show that there were any such definite or certain terms in reference to any policy.

Under the statute of Pennsylvania whenever, under the terms of any policy of life insurance or under any written agreement supplemental thereto, the proceeds are retained by the company at maturity or otherwise, no person entitled to any part of such proceeds or any so-called interest due thereon is permitted to commute, anticipate, encumber, alienate, or assign the same or any part thereof if such permission is expressly withheld by the terms of the policy or supplemental agreement; and the company shall not be required to segregate such funds, but may hold them as a part of its general corporate funds.[6] This supports the view that there was no indebtedness owing from the petitioner to the beneficiary within the meaning of the Federal revenue acts and that the 3 percent paid under Option D did not constitute deductible interest.

There is in reality, in the exercise of Option D, no new contract entered into between the petitioner and either the insured or the beneficiary. The Pennsylvania statute requires that each policy shall constitute the entire contract.[7] In any event, election of this sort of payment is founded primarily upon the provisions of, and is made by virtue of, the original contract of insurance out of which any obligation or change thereof in this respect arises. Hence, it is immaterial whether there is a new or supplemental agreement. Even if we assume, for purposes of discussion, that there was a new contract between the insurer and the beneficiary in those instances where

---

[6] Section 514 of Title 40 of Purdon's Pennsylvania Statutes, Annotated, Permanent Ed., 1930 (1923, April 26, P. L. 104, sec. 1).

[7] Section 510 of Title 40, Purdon's Pennsylvania Statutes, Annotated, Permanent Ed., 1930 (1921, May 17, P. L. 682, Art. IV, sec. 410).

858

the beneficiary made the election, such assumption would not reach those instances in which the insured made the election; and in these latter instances each and every payment made to the beneficiary was the discharge of a policy obligation, without the payment of any interest. The record contains no basis for determining what portion of the 3 percent paid under Option D was paid pursuant to election made by the insured, in his lifetime, and what portion was paid pursuant to election made by the beneficiary.

The 3 percent paid under Option D is more in the nature of income or earnings of a trust fund than interest as upon money loaned. Whether the insured or the beneficiary made the election of Option D the proceeds were, in a sense, placed in trust with the petitioner and the 3 percent, as well as the additional 1.85 percent, represents earnings upon the principal amount. The funds were in the custody of a board of trustees, and they made the awards in excess of the guaranteed or assured 3 percent. It should be borne in mind that we are dealing with a participating ordinary life insurance policy issued by a mutual company primarily for protection. We are concerned with that protection as it relates to the beneficiary after the death of the insured. The policy contemplates conservation of assets of the nature of a trust fund. This has a double aspect. One is to preserve the assets, the other is to increase them by earnings. The insurer being on the 3 percent American Experience Table of Mortality reserve basis, it is contemplated that the annual increase will be at least 3 percent. Under the arrangements here the proceeds of the policies were left with the insurer, with the duty upon it to keep them intact so that at an appointed time they might be paid over to the beneficiaries, the insurer in the meantime paying over to the beneficiaries the annual increment.[8]

That the 3 percent paid by petitioner under Option D in 1926 and 1928 is not deductible as "interest" under the applicable provisions of the revenue acts is sustained in principle by *Edith M. Kinnear*, 20 B. T. A. 718, wherein it is held that so-called "interest" such as we have presented here constitutes "earnings" and as such is included in gross income of the beneficiaries within the meaning of section 213 (b)(1), Revenue Act of 1926 (similar to section 22 (b)(1), Revenue Act of 1928), construed in the light of the statement accompanying the Conference Report to the House of Representatives submitted with the Revenue Bill of 1926, which, in effect, treats amounts left with life insurance companies in the

[8] To the effect that proceeds of policies left with a life insurance company under options similar to Option D are held by the company "as a trust fund", see The Essence of Life Insurance, by William Breiby, *supra.*

manner provided for in Option D as being " placed in trust upon the death of the insured ", and the holding of the majority as to the 3 percent under Option D is contrary, in principle, to that case.

In *Edith M. Kinnear, supra,* the insurance company paid a fixed amount of 3 percent and approximately 1.85 percent in addition thereto, which is approximately the same as that paid by petitioner under Option D.

Sometimes instead of leaving the proceeds of policies with insurance companies, such proceeds are transferred to a trustee, thus creating what is known as a " life insurance trust ", the advantages being that usually a somewhat higher rate of income may be realized and that the trustee will have more latitude and assume broader discretionary powers.[9] Where proceeds are left with a life insurance company, as they were under Option D, the situation is more nearly like that created by these " life insurance trusts " than it is like the situation of debtor and creditor. That earnings or increment of such life insurance trusts is interest is untenable.

It is true that the Revenue Act of 1928 makes provision for the deduction by life insurance companies, such as the petitioner, of interest. This does not contemplate the payments of 3 percent made under Option D. It comprehends only interest in its true sense; that is, amounts paid for the use of money actually borrowed. As heretofore stated, under Option D we are dealing with an insurance obligation and not a borrowing of money by the petitioner. Even though the petitioner, under its charter, may not have the authority to borrow money, there is always the possibility that at some time it may have such authority and may borrow. Furthermore, judgments may be taken against the petitioner where policies are contested and interest may then have to be paid at a legal rate.

No provision of the statutes and nothing in the statutory scheme of Federal taxation has been called to our attention which discloses an intention on the part of Congress to allow the deduction of any portion of the 3 percent paid under Option D. Compare *Rockford Life Insurance Co.* v. *Commissioner,* 292 U. S. 382; *Penn Mutual Life Insurance Co., infra; Commonwealth Life Insurance Co.,* 31 B. T. A. 887; and *Illinois Life Insurance Co.,* 30 B. T. A. 1160, wherein it was held that life insurance companies may not deduct depreciation upon furniture and fixtures which are not used in connection with their investment business, the income from which is

---

[9] Life Insurance, by Joseph B. Mc clean, 3d Ed., 1932, p. 172.

taxed, as distinguished from its underwriting business, the income from which is not taxed.

The question of whether the petitioner is here entitled to a deduction of the 3 percent paid under Option D is not affected by the fact that it is not entitled to a deduction of 4 percent of the mean of the reserve to cover proceeds of matured ordinary life policies left with. petitioner under Option D, as held in *Penn Mutual Life Insurance Co.*, 32 B. T. A. 876 (Docket No. 59670). Upon the question involved in the payments of the 3 percent under Option D we are concerned only with whether there is express statutory authority for permitting the deduction of the 3 percent. The question of the deduction of reserves is governed by wholly different statutory language. Furthermore, if petitioner were entitled to the deduction of such payments of 3 percent upon the ground that it is not entitled to deduct 4 percent of the mean of such reserve, then the same reasoning would also require the allowance of the deduction of the 1.85 percent paid under Option D, which has been denied by the majority.

We are not here concerned with a question of policy. That is for Congress. We are concerned only with a question of statutory authority. Until Congress legislates to allow the deduction we are bound to deny it.

Upon the entire record, the conclusion that the petitioner has not sustained its burden of showing that the respondent erred in holding that the payments of the 3 percent made by it under Option D are not deductible for 1926 and 1927 is unavoidable. On the contrary, the evidence confirms the correctness of the determination of the respondent in this respect.

In the case of *Duffy* v. *Mutual Benefit Life Insurance Co.*, 272 U. S. 613, relied upon by the majority, wherein it is stated that upon the maturity of a policy in a mutual company the policyholder becomes a creditor with an enforceable right and for the first time there is an indebtedness, the question presented was wholly different from any question presented here. The question there presented was whether the funds constituting the legal reserve of a life insurance company were invested capital within the meaning of section 207 (a) of the Revenue Act of 1917, which imposed a war excess profits tax. The Court held that the reserves did not constitute a present existing liability or indebtedness. The Court there used the word "indebtedness" in the broad general sense of "obligation", rather than in any restricted technical sense. See *City of Perry* v. *Johnson*, 106 Okla. 32; 233 Pac. 679, 680; *In re Board of Rapid-Transit Commissioners*, 49 N. Y. S. 60, 69; and *Wilcoxon* v. *City of Bluffton*, 153 Ind. 267; 54 N. E. 110, 115.